**M. & J. TRACY, Inc. v. THE OVER-BROOK et al.**

**BERWIND–WHITE COAL MINING CO. v.**

**THE OVERBROOK et al.**

**THE CAPE LAWRENCE.**

**THE SANTIAGO.**

**THE NORLYS.**

**THE EUREKA 115.**

Nos. 17880, 17866.

United States District Court
E. D. New York.

Nov. 3, 1950.

Macklin, Speer, Hanan & McKernan, New York City (Charles J. Carroll, Jr., New York City, of counsel), for libellants.

Burlingham, Veeder, Clark & Hupper, New York City (Frederic Conger, New York City, of counsel), for Tug Overbrook and Pennsylvania R. Co., Claimant.

Frank J. Parker, U. S. Atty., Brooklyn, N. Y. (Leo J. Curren, New York City, of counsel), for United States of America, respondent.

Kirlin, Campbell, Hickox & Keating, New York City (Eugene Gilligan, New York City, of counsel), for M. V. Norlys, Impleaded.

INCH, Chief Judge.

These actions arise out of a collision between the tanker Santiago and the tow of the tug Overbrook in New York Harbor, on February 17, 1945. One suit is brought by M. & J. Tracy, Inc., as owner of the barge Cape Lawrence, one of the barges in the Overbrook tow, against both the tug Overbrook and the United States, as owner of the tanker Santiago, for damages to the barge resulting from the collision. The Pennsylvania Railroad Company, claimant of the Overbrook, has impleaded the tanker Norlys.

The second suit is by the Berwind-White Coal Mining Company, as owner of another barge in the Overbrook tow, viz., the Eureka 115, also damaged in the collision. Except for libellant, the parties in the second action are the same as in the first, and both actions have been consolidated for the purposes of trial only.

In the early afternoon of February 17, 1945 the tug Overbrook, with six loaded coal barges in tow on two hawsers, was proceeding from South Amboy, N. J., out of the Kill Van Kull, bound for the Pennsylvania Railroad Company stakeboat off the Statue of Liberty. The tow was made up in three tiers. There were three barges in the first tier with two barges tailing on the port and middle barges, and one barge in the third tier tailing on the middle barge of the second tier. While the tide in the Kills was ebb, the tide in the Bay was flood, so that the general tendency of the tide was upward and around Robbins Reef. The weather was clear and the wind light.

Just before coming out of the Kills the Overbrook tow was passed on its starboard side by the tanker Santiago on its way out to sea by way of the Narrows. The Santiago was fully loaded with gasoline and a deck cargo of airplanes, and was assisted by two tugs, one on each side of its bow. The Santiago pulled to port across the bow of the Overbrook and then, coming out into the Bay, turned to starboard and headed into the tide down the Bay. At this time the tankship Norlys had been proceeding out of the Kills several ship lengths ahead of the Santiago enroute to an anchorage just below the St. George Ferry. Due to wartime conditions there was considerable congestion in and around the Staten Island anchorages and the adjacent channels.

On reaching its anchorage the Norlys dropped anchor. When the Norlys so anchored, the Santiago suddenly reversed its engines full speed astern, ordered its assisting tugs to do likewise and dropped its port anchor with 30 fathoms of chain. The Santiago's log shows that its engines were kept full speed astern for three minutes and that ten minutes elapsed from the time its engines were reversed until they were again ordered "slow ahead". During part of this time the Santiago, aided by the flood tide, ranged astern. In executing this sudden maneuver the Santiago gave no signal of any kind, and sent no lookout astern.

In the meanwhile the Overbrook, which had been approaching close to the stern of the Santiago, noticed the Santiago dropping back and blew two whistles. As the tug's hawsers passed the Santiago's stern, the tanker continued to drop back, and the Overbrook then blew an alarm and put its helm to port in an attempt to pull its tow clear of the Santiago's stern. However, there was a contact between the Santiago's stern and the starboard corner of the barge Cape Lawrence, the starboard barge in the first tier, forcing it against the barge Eureka 115, the middle barge in the second tier, and damaging both barges. The Santiago's log indicates that the collision oc-

curred fourteen minutes after its engines were ordered full speed astern.

■ At the trial there was no showing that the Norlys was improperly brought to anchor, or that it was in any way at fault, and the parties voiced no objection to a dismissal of the libel and impleading petition against that vessel. Accordingly, the libel and impleading petition against the Norlys in both actions is dismissed with costs against the Pennsylvania Railroad Company, the impleading petitioner.

■ While it may have been necessary for the Santiago to stop as suddenly as it did, I am satisfied that it was negligent in putting its engines, and those of its assisting tugs, full speed astern, and dropping back on its anchor without sounding an alarm or sending a lookout astern. Having passed the Overbrook tow a short time before, and having crossed its bow twice in turning to go down the Bay, the Santiago must have known that the tow was in the vicinity of its stern. Under those circumstances, the Overbrook was entitled to some warning from the Santiago that it was coming to a sudden stop and was about to make sternway. The Santiago's log entry to the effect that the collision occurred fourteen minutes after its engines were ordered reversed indicates there was ample time to sound an alarm or send a lookout astern.

■ I find, however, that the Overbrook was equally at fault. In coming out of the Kills the Overbrook had the Santiago ahead of it and in full view at all times. Pulling a heavy and unwieldy tow, the Overbrook was obliged to keep its barges at a safe and reasonable distance from the tanker and not pull them as close as it did to the stern of the tanker. The master of the Overbrook was not justified, in the exercise of reasonable care, in believing that the Santiago, in passing through this congested area would not alter its course or speed. Further, there appears to have been no prior necessity for the Overbrook not to have allowed for a greater distance between its tow and the Santiago. Moreover, there is some evidence that the Overbrook's master was negligent in putting his helm to port when a collision appeared imminent, since that operation had the effect of swinging the heavy tow further in toward the stern of the tanker. Thus, I find that the libellant in each action is entitled to a decree, with costs, against both the Overbrook and the United States, jointly and severally.

Findings of fact and conclusions of law have been filed simultaneously herewith.

### Findings of Fact.

1. At all the times mentioned in the libels, Berwind-White Coal Mining Company was a Pennsylvania corporation and owner of barge Eureka 115; M. & J. Tracy, Inc. was a New York corporation and owner of barge Cape Lawrence; The Pennsylvania Railroad Company was a Pennsylvania corporation and owner of the tug Overbrook; United States of America was a corporation sovereign and owner and operator of the tanker Santiago, and Tanker Corporation was owner of the motor vessel Norlys.

2. Up to the time of the collision the barges Cape Lawrence and Eureka 115 were tight, staunch, strong and seaworthy.

3. On the early afternoon of February 17, 1945 the tug Overbrook, with six loaded coal barges in tow on two hawsers, was proceeding from South Amboy, N. J., out of the Kill Van Kull, bound for the Pennsylvania Railroad Company stakeboat off the Statue of Liberty. There were three barges in the first tier with two barges tailing on the port and middle barges, and one barge in the third tier tailing on the middle barge of the second tier.

4. While the tide in the Kills was ebb, the tide in Upper New York Bay was flood, so that the general tendency of the tide was upward and around Robbins Reef. The weather was clear and the wind light.

5. Just before coming out of the Kills the Overbrook tow was passed on its starboard side by the tanker Santiago on its way out to sea by way of the Narrows. The Santiago was fully loaded with gasoline and a deck cargo of airplanes, and was assisted by two tugs, one on each side of its bow. The Santiago pulled to port across the bow of the Overbrook and, then, com-

ing out into the Bay turned to starboard and headed into the tide down the Bay.

6. At this time the tankship Norlys had been proceeding out of the Kills, several ship lengths ahead of the Santiago, enroute to an anchorage just below the St. George Ferry.

7. Due to wartime conditions there was considerable congestion in and around the Staten Island anchorages and the adjacent channels.

8. On reaching its anchorage, the Norlys dropped anchor. Thereupon the Santiago suddenly reversed its engines full speed astern, ordered its assisting tugs to do likewise, and dropped its port anchor with 30 fathoms of chain. During part of the time that the Santiago's engines were reversed and subsequently ordered ahead, the Santiago, aided by the flood tide, ranged astern. In executing this sudden maneuver, the Santiago gave no signal of any kind and sent no lookout astern.

9. In the meanwhile the Overbrook which had been approaching close to the stern of the Santiago, noticed the Santiago dropping back and blew two whistles. As the tug's hawsers passed the Santiago's stern, the tanker continued to drop back, and the Overbrook then blew an alarm and put its helm to port in an attempt to pull its tow clear of the Santiago's stern.

10. There was a contact between the Santiago's stern and the starboard corner of the barge Cape Lawrence, the starboard barge in the first tier, forcing it against the barge Eureka 115, the middle barge in the second tier, and damaging both barges.

11. The collision occurred about fourteen minutes after the Santiago's engines were ordered reversed.

### Conclusions of Law.

I. The motor vessel Norlys was without fault in anchoring ahead of the Santiago, and the libel and impleading petition against it are dismissed in both actions with costs against the Pennsylvania Railroad Company, the impleading petitioner.

II. The Santiago was at fault in putting its engines full speed astern and mak-ing sternway without sounding signals or sending a lookout astern.

III. The Overbrook was equally at fault in failing to keep its tow at a safe and reasonable distance from the Santiago, and in putting its helm to port when the collision appeared imminent, with the result that its heavy tow swung further in toward the Santiago's stern.

IV. Libellant in each action is entitled to a decree, with costs, against the Overbrook and the United States of America, jointly and severally.